# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| v. | ) | **Criminal Case No. 08-93 (RJL)** |
| | ) | |
| **JOHN STAGLIANO,** | ) | |
| **JOHN STAGLIANO, INC.,** | ) | **FILED** |
| **EVIL ANGEL PRODUCTIONS, INC.,** | ) | |
| | ) | AUG 0 4 2010 |
| **Defendants.** | ) | Clerk, U.S. District & Bankruptcy |
| | | Courts for the District of Columbia |

## MEMORANDUM OPINION
### (July 30, 2010)

The defendants John Stagliano, John Stagliano, Inc., and Evil Angel

Productions, Inc., were charged in a seven-count Indictment with assorted violations

of several federal obscenity statutes.[1] In effect, the government accused them of

distributing in interstate commerce two obscene movies titled "Milk Nymphos" and

"Storm Squirters 2 'Target Practice'" and a movie trailer titled "Fetish Fanatic

Chapter 5" that was posted on a website allegedly owned by the defendants.[2] Before

---

[1] Among the statutes charged in the Indictment were: (1) 18 U.S.C. § 1465, transporting obscene matters for sale or distribution; (2) 18 U.S.C. § 1462, using a common carrier or interactive computer service to transport obscene matters; (3) 18 U.S.C. § 1466, engaging in the business of selling or transferring obscene matter; and (4) 47 U.S.C. § 223(d), displaying obscene material on the Internet in a manner available to persons under 18.

[2] Ultimately, I dismissed with prejudice Counts 3 and 7 and part of Count 6, all involving the movie trailer, because the FBI's original disc containing the trailer was so defective that it was not sufficiently reliable to be introduced into evidence. As for the remaining counts involving the two full-length movies, I granted the defendants' motion for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure due to the inadequacy of the government's proof linking the defendants to the distribution of the movies into the District of Columbia.

the trial commenced, the defendants notified the Court that they intended to call as many as five expert witnesses to testify on their behalf. The defendants eventually reduced that number to two. Even though the government expressed no intention to call any expert witnesses for its case-in-chief, it notified the Court that it intended to call a rebuttal expert, if the need arose. On July 9, 2010, in a ruling from the bench, I rejected the parties' proffered expert witnesses because the defendants had failed to establish that the principles and methodologies underlying their proposed expert testimony were sufficiently reliable and useful to the jury to satisfy Federal Rule of Evidence 702. This Memorandum Opinion sets forth more fully the rationale for my ruling.

## BACKGROUND

The parties offered their proposed experts to opine on various elements of the obscenity test set forth by the Supreme Court in *Miller v. California*, 413 U.S. 15 (1973). Under that test, a work is obscene if the jury determines (1) "that the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest"; (2) that the average person applying contemporary community standards would find that "the work depicts or describes, in a patently offensive way, sexual conduct"; and (3) that a reasonable person would find that "the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." *Id.* at 24 (internal quotation marks omitted); *Pope v. Illinois*, 481 U.S. 497, 500 (1987) (incorporating the community standards element of the first prong into the

second prong and mandating that the third prong be evaluated using an objective "reasonable person" standard).

As part of their case-in-chief, the defendants intended to call two expert witnesses, neither of whom had ever been qualified as an expert in a federal court for any of the purposes for which they were offered in this case. (*Daubert* Hr'g Tr. 80:13-81:15, 158:11-20, June 24, 2010). The first was Lawrence Sank, Ph.d ("Dr. Sank"), a clinical psychologist who practices at the Cognitive Therapy Center of Greater Washington. The defendants expected him to offer an expert opinion that, in light of the community standards here in the District of Columbia, the works charged in the Indictment neither appealed to the prurient interest nor were patently offensive and that, taken as a whole, the works did not lack serious scientific value. The second proposed expert was Constance Penley, Ph.d. ("Prof. Penley"), a professor of film studies at the University of California, Santa Barbara. The defendants expected her to offer an expert opinion that the works, taken as a whole, did not lack serious artistic value.

The government did not seek to qualify an expert witness for its case-in-chief, but if necessary, it intended to call a rebuttal expert witness. That proposed witness was Chester W. Schmidt, Jr., M.D. ("Dr. Schmidt"), the Chief Medical Director at Johns Hopkins HealthCare and a professor of psychiatry at The Johns Hopkins University School of Medicine. In 1971, Dr. Schmidt co-founded the sexual behavior consultation unit at the Johns Hopkins Hospital. (*Id.* at 172:23-24). The government

expected him to offer expert opinion testimony rebutting Dr. Sank's opinion, in effect, that the charged works had serious scientific value.

## DISCUSSION

Any assessment of the admissibility of the parties' proposed expert testimony must begin with the Supreme Court's own observations in *Paris Adult Theatre I v. Slaton*, 413 U.S. 49 (1973), about the general value of expert testimony in obscenity cases. Because films "are the best evidence of what they represent," *id.* at 56, the Supreme Court noted that the task of judging whether a particular film is obscene "is not a subject that lends itself to the traditional use of expert testimony," *id.* at 56 n.6. "Such testimony is usually admitted for the purpose of explaining to lay jurors what they otherwise could not understand," but said the Supreme Court, "[n]o such assistance is needed by jurors in obscenity cases." *Id.* Notwithstanding that the Supreme Court regards "the materials as sufficient in themselves for the determination of the [obscenity] question," *id.* at 56 (internal quotation marks omitted), expert testimony is not *per se* inadmissible in all obscenity cases. To the contrary, the Supreme Court itself has made clear that the "defense should be free to introduce appropriate expert testimony." *Kaplan v. California*, 413 U.S. 115, 121 (1973). Of course, the law is also clear that trial courts retain "wide discretion" in obscenity trials "to admit [or] exclude evidence, and this is particularly true in the case of expert testimony." *Hamling v. United States*, 418 U.S. 87, 108 (1974).

Given these principles, the question at hand is whether the expert opinion testimony that the defendants sought to introduce in this case was indeed appropriate

4

under the Federal Rules of Evidence.  The starting point for this inquiry is Rule 702,

which provides as follows:

> If scientific, technical, or other specialized knowledge will assist the
> trier of fact to understand the evidence or to determine a fact in issue, a
> witness qualified as an expert by knowledge, skill, experience, training,
> or education, may testify thereto in the form of an opinion or otherwise,
> if (1) the testimony is based upon sufficient facts or data, (2) the
> testimony is the product of reliable principles and methods, and (3) the
> witness has applied the principles and methods reliably to the facts of
> the case.

Against the backdrop of this Rule is the Supreme Court's decision in *Daubert v.*

*Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), which established a

framework to guide trial courts in performing their "gatekeeping" function.  Under

*Daubert*, if a party proffers expert testimony that is scientific in nature, it is

admissible only if the trial court concludes:  (1) that the reasoning or methodology

underlying the testimony is scientifically valid, and (2) that the reasoning or

methodology will assist the trier of fact to understand or determine a fact in issue.  *Id.*

at 592-93.  For obvious reasons, the focus is "solely on principles and methodology,

not on the conclusions that they generate."  *Id.* at 595.  To determine whether a

particular theory or methodology is "scientifically valid," courts generally look to

several factors:  (1) "whether the theory or technique can be and has been tested"; (2)

"whether the theory or technique has been subjected to peer review and publication";

(3) "the method's known or potential rate of error"; and (4) "whether the theory or

technique finds general acceptance in the relevant scientific community."  *Ambrosini*

*v. Labarraque*, 101 F.3d 129, 134 (D.C. Cir. 1996) (citing *Daubert*, 509 U.S. at 593-

94). These factors are not exhaustive, nor are they dispositive or even applicable in every case. *Id.* To be sure, the inquiry is a flexible one, but the overarching purpose is to determine whether the proffered testimony is reliable—that is, grounded in the scientific method—and, if so, whether it is relevant or helpful to the jury's factual inquiry.

Of course, the *Daubert* framework is not limited to scientific testimony. It is equally applicable to any testimony that is based on technical or specialized knowledge. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 148-49 (1999). Particularly persuasive is the advisory committee's note for Rule 702, which explains that "[w]hile the relevant factors for determining reliability will vary from expertise to expertise, [Rule 702] rejects the premise that an expert's testimony should be treated more permissively simply because it is outside the realm of science." Fed. R. Evid. 702 advisory committee's note, 2000 amendments. Indeed, on its face, Rule 702 draws no distinction between the requirements for qualifying opinion testimony based on scientific knowledge and the requirements for qualifying opinion testimony based on any other specialized knowledge.

On June 24, 2010, I held a *Daubert* hearing to elicit testimony from the prospective expert witnesses about their qualifications and about the general theories, principles, or methodologies that will undergird their testimony at trial.[3] Applying the

---

[3] Because the *Daubert* hearing preceded the trial, I took special precautions to prevent any pretrial disclosure of the expert testimony that the defendants hoped to elicit in support of their case-in-chief. In particular, I instructed the government to focus its inquiry on the general principles and methods of the experts, not on the

*Daubert* principles to the testimony elicited at the hearing and to all other relevant facts in the record, I found that the reasoning and methodology of the defendants' proposed expert witnesses were not sufficiently reliable to qualify them as experts in this case. Accordingly, for the reasons set forth hereafter, I did not allow Dr. Sank or Prof. Penley to testify as experts on the issues for which they were offered. As such, I also concluded that, in the absence of Dr. Sank's testimony, there was no basis for the government's rebuttal witness, Dr. Schmidt, to testify.

## I.    Dr. Lawrence Sank

### A.    Expert Opinion On Community Standards

The defendants sought to offer Dr. Sank's expert opinion on all three elements of the *Miller* test. With respect to the first two elements, they expected Dr. Sank to testify that, in his expert opinion, the works charged in this case neither appealed to the prurient interest nor were patently offensive according to the community standards of the District of Columbia. The defendants contended that Dr. Sank was uniquely situated to opine on the community standards of the District because of his clinical practice, which gave him intimate, day-to-day access to the private thoughts of his patients, many of whom were members of the community, concerning particularly sensitive issues pertaining to sex. Because of that access, so the theory went, he could have provided useful insight into the actual level of community acceptance regarding sexually explicit material that would not otherwise have been known to the average

---

specific application of those principles and methods to the films charged in the Indictment.

juror because people in the community tend not to discuss openly their views about sex.

Dr. Sank's *Daubert* testimony did not convince me, however, that he had any greater insight into the community standards of the District relating to a particular work's prurient appeal or offensiveness than the average juror would have had. If anything, his opinion would have been distorted, and potentially misleading to the jury, because it would have been based entirely on his interaction with people who come to him for treatment thinking that they have a psychological problem or a particular sexual problem and are willing to speak openly about it. In addition, Dr. Sank, by his own admission, sees a clientele comprised largely of college-educated or upper middle class persons who can afford his rates ($300 per hour) or who have the necessary insurance coverage to have his fees reimbursed. (*Daubert* Hr'g Tr. 75:23-25, 76:1-25, 77:1-15, June 24, 2010). In short, had Dr. Sank been allowed to testify, his opinion would not have been grounded on a fair and accurate cross-section of the community, nor could it have been given the nature of his clinical work. Consequently, I found that the basis for Dr. Sank's expert opinion regarding the community standards of the District of Columbia was wholly unreliable and that, as a result, his testimony on the first two elements of the *Miller* test was inadmissible under Rule 702.

Furthermore, because jurors can, as the Supreme Court noted, "draw on [their] own knowledge of the views of the average person in the community or vicinage from which [they] come[]," *Hamling*, 418 U.S. at 104, Dr. Sank's testimony would have

8

done very little to assist the jury. Indeed, for the reasons just explained, it would more likely have led the jury astray. Thus, whatever slight probative value it might have had would have been far outweighed by its tendency to mislead the jurors. Therefore, Federal Rule of Evidence 403, which excludes relevant evidence "if its probative value is substantially outweighed by the danger of . . . misleading the jury," also barred Dr. Sank's testimony on the first two elements of the obscenity test.

### B.     Expert Opinion On Serious Scientific Value

With respect to the third element of the *Miller* test, the defendants intended to elicit Dr. Sank's expert opinion that the charged works did not lack serious scientific value. The basis for this opinion was Dr. Sank's practice of treating patients who have a diagnosable paraphilia by having them watch films from his personal film library or from the Internet depicting others performing the sexual acts that define the paraphilia. Dr. Sank described a paraphilia as an "interest[] in areas of sexuality that seem off the beaten path and nonetheless are required for [a person] to be sufficiently aroused to want to engage in sexual behavior." (*Daubert* Hr'g Tr. 14:15-17). The films he prescribes are oftentimes, though not always, commercially produced adult movies available to the general public. The purpose of Dr. Sank's approach, however, is not to "cure" the patient of his or her paraphilia—as the term "cure" is normally understood. Indeed, Dr. Sank testified that he did not regard certain paraphilias—like, for instance, urophilia, which is a predilection towards urine as part of sexual activity—as pathological. (*Id.* at 20:5-11, 17:9-10). Rather, the purpose of his treatment in general is to normalize the patient's behavior or, in his words, to help

9

people "feel more normal" in the sense of making them comfortable with their off-beat sexual inclinations. (*Id.* at 21:21-22:2, 31:10-32:4). Dr. Sank testified that others in his field of psychology would agree that adult films, whether produced commercially or not, should be prescribed to patients for that purpose. (*Id.* at 23:22-24:3). He referenced the *Journal of Sex and Marital Therapy* as the only peer-reviewed publication he could recall that recommends the practice and that even goes so far as to review and critique adult videos that could be used for treatment purposes. (*Id.* at 24:3-14, 25:1-20). When asked, however, whether it was the generally accepted practice in his field, Dr. Sank testified that it was "a general practice," (*id.* at 29:25), noting that some therapists will prescribe adult movies as treatment and that some do not, (*id.* at 29:19-21). He went on to say that the practice is accepted in his field in the sense that no one would think that it is unethical. (*Id.* at 37:17-20).

Of course, the fact that Dr. Sank and others in his field believe this treatment to be effective does not *alone* establish the reliability of his opinion on the *scientific* merit of the adult films charged in this case. To be reliable, an opinion on scientific merit must be grounded in scientific knowledge. Indeed, the Supreme Court in *Daubert* explicitly observed that "'[s]cientific' implies a grounding in the methods and procedures of science" and that "'knowledge' connotes more than subjective belief or unsupported speculation." 509 U.S. at 590. Thus, to qualify as "scientific knowledge," "an inference or assertion must be derived by the scientific method." *Id.*

In that respect, there was virtually no evidence supporting the reliability of the treatment that Dr. Sank said would provide the basis for his opinion. Dr. Sank

effectively admitted, for instance, that he had never published any books or articles

subject to peer review about the clinical use of adult films for the treatment of

paraphilias. (*Daubert* Hr'g Tr. 38:18-39:23). The only work he referenced was a

manuscript on marriage preparation that he said was on his computer. (*Id.* at 38:23-

24, 39:1). Nor was there anything in the record indicating that Dr. Sank had

undertaken the rigorous process, grounded in the scientific method, of systematically

testing whether his method of treatment was actually effective. Furthermore, when

asked whether he knew of any scientific study by anyone else testing the effectiveness

of adult movies in treating paraphilias, he could not recall any. (*Id.* at 56:25-57:5,

58:2-4). When asked whether he knew of any major university that had studied the

effectiveness of using adult movies for treatment, he did not know of any. (*Id.* at

58:15-19). Finally, when asked whether he could recall seeing any article in a

reputable journal in his field, including the *Journal of Sex and Marital Therapy*,

testing the efficacy of using adult movies to treat certain sexual disorders, he could

not recall any. (*Id.* at 59:9-13, 60:6-11).

The absence of any scientific support for this practice cannot possibly be

attributed to its novelty or to limited interest in the subject because, by Dr. Sank's

own admission, it is a common practice. (*Id.* at 58:5). But just because a practice is

common does not—by itself—make it scientifically valid. Indeed, it is a curious fact

that such a common practice had not—at least to Dr. Sank's knowledge—been

subjected to the rigors of scientific testing. Unable to identify any scientific authority

that tended to show the effectiveness and value of prescribing adult films for

treatment, Dr. Sank simply rested on his assertion that the practice was "efficacious in my work." (*Id.* at 58:20-21).

In their argument to the Court, defense counsel stressed that personal knowledge and experience can suffice to establish the reliability of expert opinion testimony. But implicit in the very case upon which they relied, *Groobert v. President and Directors of Georgetown College*, 219 F. Supp. 2d 1 (D.D.C. 2002), is the premise that personal knowledge and experience are not an adequate source of reliable expert testimony when traditional sources are available. The *Groobert* court noted, for instance, that "[i]n matters where [the *Daubert*] factors *do not* apply, reliability concerns *may* focus on personal knowledge or experience." *Id.* at 6 (emphasis added). The court further observed that the reliability and validity of personal experience is "particularly true with *non-scientific* testimony." *Id.* at 7 (emphasis added). To the extent that Dr. Sank sought to render scientific, as opposed to non-scientific, testimony, I concluded that his reliance on personal knowledge and experience was inadequate to establish the reliability of his testimony precisely because the traditional indicia of reliability for evaluating scientific knowledge were applicable.

Because Dr. Sank's method of treatment had been neither tested nor peer reviewed through publication by him or others, and notwithstanding its apparent acceptance among sex therapists, I concluded that the methodological basis for his opinion testimony was not sufficiently reliable to qualify him as an expert under Rule

702. For that reason, I did not allow Dr. Sank to testify on the scientific value of the charged films.

In any event, even if Dr. Sank's method of treatment had somehow overcome the relatively low evidentiary hurdle of reliability, the prejudicial effect of his testimony would have far outweighed whatever probative value it might have had. Given the tendency of lay jurors to place special weight on scientific expert testimony, coupled with the already shaky reliability of the method upon which Dr. Sank was expected to base his opinion, I concluded that the danger of unfair prejudice and the danger of misleading the jury substantially outweighed the probative value of Dr. Sank's proposed testimony. As such, I ruled that his testimony on the scientific merit of the charged works was also inadmissible under Rule 403.

## II.     Professor Constance Penley

To address the artistic merit of the works charged in the Indictment, the defendants intended to call Prof. Penley of the University of California at Santa Barbara. Not surprisingly, they expected her to offer an opinion that the works in question did not lack serious artistic value. Because artistic inquiry, by its very nature, does not lend itself to the same sort of objective analysis and testing as scientific inquiry, I looked to other indicia to evaluate the reliability of her proposed expert testimony.

Notwithstanding her impressive credentials as a professor of film studies in general and of feminist art theory in particular, my examination of Prof. Penley's testimony from the *Daubert* hearing raised serious doubts about the reliability and

helpfulness of her opinion testimony.  When asked, for instance, whether she had ever written or lectured on the serious artistic value of "hard core" pornography—that is, films showing actual depictions of repeated sex acts, some of which are generally regarded as paraphilias—Prof. Penley acknowledged that she had not.  (*Daubert* Hr'g Tr. 134:9-16).  When asked whether she was familiar with others in her field who had written on the serious artistic value of "hard core" pornography, she could only think of one person, but she averred that, to date, that person's article had merely been *accepted* for publication in a peer-reviewed journal.  (*Id.* at 134:17- 135:3).  She was unclear about when the article would actually be published and thereby subjected to the scrutiny of peer review.

Although these deficiencies do not *alone* disqualify Prof. Penley, her answers to questions about the nature of art and, in particular, about whether a meaningful determination could be made about what constitutes serious art—when combined with the total absence of peer-reviewed analysis on the serious artistic value of "hard core" pornography—convinced me that her proposed expert opinion testimony could not clear the bar of reliability required by *Daubert*.  For instance, when asked whether all film is an art form, she gave an elusive answer—especially for one claiming to be an expert on art—saying that "it is very hard for me to talk about capital A art, capital A film or even capital P pornography as an abstraction." (*Id.* at 138:1-4).  She stressed that she "would want to be able to see it and analyze it before [she has] opinions about it." (*Id.* at 138:4-5).  When asked whether there is some pornography that does not fall into the category of art, Prof. Penley explained that, in her college class, she

14

merely teaches "small P pornography" and that she wants her students "to come out of the class and be able to have opinions about pornography, about pornographic filmmaking but based on knowledge of what it consists of." (*Id.* at 139:13-17). Nothing in any of her answers suggested that she regards pornography as anything other than just another form of art. When asked again whether she had ever seen pornography that she would not consider to be art, the most she would say is: "I certainly have seen some films that weren't to my taste." (*Id.* at 139:18-20). She went on to explain that "[a]rt as a practice, a creative practice, . . . is a matter of taste." (*Id.* at 139:22-23). Continuing further, she observed: "A lot of distinctions that we make between say eroticism and pornography . . . [are] a matter of taste. But what I like is erotic. What you like is pornographic and vice versa." (*Id.* at 140:4-6). Thus, when asked a final time whether those distinctions are a matter of taste, Prof. Penley confirmed, "I think for the most part it is." (*Id.* at 140:8).

Notwithstanding her initial testimony that art is essentially a matter of taste, Prof. Penley did later acknowledge, in response to one of my questions, that not all pornography has serious artistic value. (*Id.* at 151:3-10). She testified that an average person unschooled in classical art would be unable, without the assistance of an expert, to truly understand whether or not a work is art. (*Id.* at 152:10-17). When asked about how she would determine whether "hard core" pornography has serious artistic value, Prof. Penley merely testified that she would look at "everything about the content, everything about the style, everything about the way the film was scripted, cast, performed, what is the shooting, the editing, the construction of the

mise-en-scene, in other words, everything that is staged before the camera is even turned on." (*Id.* at 150:14-19). Surprisingly, that is the entire sum of her explanation about the method she would use to judge artistic value. Prof. Penley's methodology—what little can be gleaned from it—is so nebulous, subjective, and lacking in rigor and detail as to cast serious doubt, not only on the reliability of her opinion testimony, but on its usefulness to the jury as well. After all, the more subjective her mode of analysis, the less need the jury would have for an expert with her background. Here again, I am persuaded by the admonition in the advisory committee's note for Rule 702 that the "more subjective and controversial the expert's inquiry, the more likely the testimony should be excluded as unreliable." Fed. R. Evid. 702 advisory committee's note, 2000 amendments.

Because Prof. Penley was not particularly clear on whether art is just a subjective matter of taste or whether there is in fact a meaningful line separating serious art from lesser art, I did not find her putative approach to evaluating the serious artistic value of a work, which is subjective and notably lacking in detail, to be a particularly reliable or helpful guide for the jury. Having considered the totality of her *Daubert* testimony, I found that the defendants failed to meet their burden of demonstrating that the methodology underlying her opinion was reliable and would truly assist the jury in evaluating the serious artistic value of the charged works. Therefore, in light of the Supreme Court's specific observation that obscenity "is not a subject that lends itself to the traditional use of expert testimony," *Paris Adult Theatre I*, 413 U.S. at 56 n.6, I refused to permit Prof. Penley to testify on the serious artistic

value of the explicit pornographic materials charged in this case absent a much stronger showing that her methodology for judging the artistic merit of pornographic film is reliable and useful to the jury.

## CONCLUSION

Under *Daubert*, presenting an expert's qualifications, conclusions, and assurances of reliability are not enough. *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995). Simply put, the length of an expert's curriculum vitae is valueless if the principles and methods underlying the expert's proposed opinion testimony are either unreliable, or unhelpful, to the jury. The proponent of the expert testimony, of course, bears the burden of demonstrating its reliability and usefulness. On that score, the defendants here failed. Accordingly, for all of the foregoing reasons, the Court rejected both Dr. Sank and Prof. Penley as expert witnesses in this case.

RICHARD J. LEON
United States District Judge