1               UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA
2      --------------------------X
       UNITED STATES OF AMERICA,      Docket No. 08-93
3                      Plaintiff,

4            v.                   Washington, D.C.
                                 **December 22, 2009**
5                                 11:15 a.m.

6      JOHN A. STAGLIANO,
       JOHN STAGLIANO, INC., EVIL
7      ANGEL PRODUCTIONS, INC.,
                       Defendants.
8      --------------------------X

9                       ***STATUS HEARING***
               *BEFORE THE HONORABLE RICHARD J. LEON*
10               *UNITED STATES DISTRICT JUDGE*

11     APPEARANCES:
       For the Plaintiff:     U.S. DEPARTMENT OF JUSTICE
12                            By:  Ms. Pamela S. Satterfield
                                   Ms. Bonnie G. Hannan
13                            1301 New York Avenue, N.W.
                              Suite 500
14                            Washington, D.C.  20530
                              202.353.2485
15                            *pamela.satterfield@usdoj.gov*
                              *bonnie.hannan@usdoj.gov*
16
       For the Defendants:    SIRKIN, KINSLEY & NAZZARINE
17                            By:  Mr. H. Louis Sirkin
                                   Ms. Jennifer M. Kinsley
18                            810 Sycamore Street, 2nd Floor
                              Cincinnati, Ohio  45202
19                            513.721.4876
                              *lsirkin@skn-law.com*
20                            *jkinsley@skn-law.com*

21                            DAVIS WRIGHT TREMAIN, L.L.P.
                              By:  Mr. Robert Corn-Revere
22                            1919 Pennsylvania Avenue, N.W.
                              Suite 200
23                            Washington, D.C. 20006
                              202.973.4225
24                            *bobcornrevere@dwt.com*

25

```
 1   APPEARANCES:  (CONT'D.)

 2                           LAW OFFICES OF ALLAN B. GELBARD
                             By:  Mr. Allan B. Gelbard
 3                           15760 Ventura Boulevard
                             Suite 801
 4                           Encino, CA  91436
                             818.386.9200
 5                           xxxesq@aol.com

 6                           LIPSITZ GREEN SCIME CAMBRIA, L.L.P.
                             By:  Mr. Paul J. Cambria, Jr.
 7                           42 Delaware Avenue
                             Suite 120
 8                           Buffalo, NY  14202
                             716.849.1333
 9                           pcambria@glaw.com

10   Court Reporter:         Catalina Kerr, RPR, CRR
                             U.S. District Courthouse
11                           Room 6716
                             Washington, D.C.  20001
12                           202.354.3258
                             catykerr@msn.com

13

14   Proceedings recorded by mechanical stenography, transcript

15   produced by computer.

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P-R-O-C-E-E-D-I-N-G-S

 2            (11:15 A.M.; OPEN COURT; DEFENDANT PRESENT WITH HIS

 3  ATTORNEYS.)

 4            THE DEPUTY CLERK:  Calling Criminal Case 08-93,

 5  United States of America versus John A. Stagliano, John

 6  Stagliano, Inc. and Evil Angel Productions, Inc.

 7            Would counsel please come forward and identify

 8  yourselves for the record.

 9            MS. SATTERFIELD:  Good morning, Your Honor.  Pamela

10  Satterfield on behalf of the United States.

11            THE COURT:  Welcome back.

12            MS. HANNAN:  Good morning, Your Honor.  Bonnie

13  Hannan on behalf of the United States.

14            THE COURT:  Welcome back.

15            MR. GELBARD:  Good morning, Your Honor.  Allan

16  Gelbard for Mr. Stagliano.  He is here in court.

17            THE COURT:  Welcome back.

18            MR. SIRKIN:  H. Louis Sirkin on behalf of John

19  Stagliano, Inc.

20            THE COURT:  Welcome back.

21            MR. CAMBRIA:  Good morning, Your Honor.  Paul

22  Cambria on behalf of Evil Angel, Inc.

23            THE COURT:  Welcome back.

24            MS. KINSLEY:  Good morning, Your Honor.  Jennifer

25  Kinsley on behalf of John Stagliano, Inc.
```

1          THE COURT:  Welcome back.

2          MR. CORN-REVERE:  Good morning, Your Honor.  Robert

3    Corn-Revere, local counsel for the Defendants.

4          THE COURT:  Welcome back.

5          All right, counsel.  I am hopefully going to have

6    completed my opinion in this case, motion to dismiss,

7    hopefully in the next three or four weeks, but I don't want

8    those three or four weeks to go agley, so I'm going to

9    announce the decision today.

10          I denied the opinion, but I will announce the ruling

11   and some of the reasoning in abbreviated form with the opinion

12   to follow, and I fully appreciate that there's probably going

13   to be a motion for interlocutory appeal.  I'm not inviting

14   one, but I appreciate the realities of the circumstance, and I

15   fully appreciate there's probably a good chance that the

16   Government will oppose a motion for interlocutory appeal.

17          So, I would like to see those three or four weeks

18   used productively.  For those who want to seek an

19   interlocutory appeal, to start preparing their pleadings, and

20   for those who would oppose it, to prepare their pleadings

21   accordingly.  Once we get past that this morning, we need to

22   focus on where the future of this case is going independent of

23   a motion for interlocutory appeal.

24          We'll get to that in a minute, so first let me go to

25   the ruling and there will be a formal opinion that will be

distributed when it's completed hopefully in three or four

weeks, but I don't want that time to go agley.  Enough time

has passed.

Before the Court are the Defendants' respective

motions to dismiss the seven-count indictment pending against

them.  At issue is the purely legal question of whether the

various obscenity statutes that form the basis of the charges

in the indictment are constitutional.

The Defendants argue that 18 U.S. Code, Section 1465

and 47 U.S. Code, Section 223(d), both of which incorporate

the, quote, community standards, close quote, and as a whole,

quote/unquote, elements of the obscenity test set forth in

*Miller v. California,* are unconstitutionally overbroad and

vague as applied to Internet speech.

They also argue that Section 223(d) is a

content-based restriction that fails strict scrutiny analysis

under the First Amendment.  Because of these constitutional

defects, the Defendants contend, at a minimum, that Counts 3

and 7 of the indictment should be dismissed.  Not

surprisingly, perhaps, the Defendants do not stop there.

In addition to their overbreadth and vagueness

claims, they argue that all counts of the indictment should be

dismissed because individuals have a substantive due process

right to possess and use obscene materials and because, as a

corollary of that right, the Defendants have a right to

1  produce and distribute those materials.

2         Finally, they argue that obscenity prosecutions in

3  the District of Columbia impermissibly burden the right to

4  copyright works that would be protected elsewhere.

5         Having carefully considered each of these arguments,

6  I have concluded that the relevant statutes withstand the

7  Defendants' constitutional challenge, and therefore, for the

8  following reasons, the Defendants' motions are denied.

9         First, the Defendants' principal argument, which

10  happens to be their best, is that Section 1465 charged in

11  Count 3 and Section 223(d) charged in Count 7 are

12  unconstitutional as applied to the Internet because the,

13  quote, community standards, close quote, and quote, as a

14  whole, close quote, requirements of *Miller*'s obscenity test

15  render both statutes overbroad.  Unfortunately for them, I

16  disagree.

17         Take first the community standards requirement.

18  Because the federal obscenity statutes apply local community

19  standards to Internet expression, the Defendants argue that

20  those statutes suppress substantially more speech than is

21  constitutionally permissible.  According to the Defendants,

22  Internet publishers cannot limit the geographic reach of the

23  materials they put on the Internet.  As a result, those

24  materials are subject to the community standards of the most

25  conservative jurisdictions in the country.

1        To avoid criminal liability, the publishers must

2   tailor their speech to conform to those standards of those

3   jurisdictions.  As a consequence, expressions that more

4   permissive jurisdictions would surely protect will be burdened

5   or chilled on the Internet.

6        Now, while a majority of the Supreme Court justices

7   in the splintered decision in *Ashcroft versus ACLU* -- I'm

8   going to refer to it as *ACLU I,* a case involving the Child

9   Online Protection Act, COPA -- voiced concern that a community

10  standards requirement, as applied to Internet prosecutions,

11  poses overbreadth problems.  Such a concern is hardly the

12  support necessary for the sweeping position Defendants

13  advance.

14       Indeed, despite that concern, a majority of the

15  Supreme Court in *ACLU I* held that reliance on community

16  standards does not by itself render COPA substantially

17  overbroad for purposes of the First Amendment.

18       The same reasoning applies here.  If the overbreadth

19  caused by applying disparate community standards to COPA did

20  not by itself render that statute unconstitutional, then any

21  overbreadth caused by applying community standards to the

22  obscenity statutes is certainly not substantial enough,

23  standing alone, to render those statutes unconstitutional.

24  The Defendants have offered no convincing evidence that shows

25  otherwise.

1          Of course, the Defendants do not contend that the

2     community standards requirement alone renders the obscenity

3     statutes overbroad.  Instead they argue that the community

4     standards requirement coupled with the requirement that the

5     allegedly obscene material be evaluated, quote, as a whole,

6     close quote, together renders the obscenity statute

7     sufficiently overbroad to be unconstitutional.

8          In particular, with respect to as the as a whole

9     requirement, the Defendants contend that the express language

10     of Section 1645 and Section 223(d) permits individual items,

11     such as a, quote, picture, close quote, or image,

12     quote/unquote, to be judged not in context but by themselves.

13     Because a fact-finder might consider an individual item

14     obscene in isolation but not in the context of a surrounding

15     website, the Defendants claim that the statutes are overbroad

16     because they suppress or chill speech that would otherwise be

17     protected.  I disagree.

18          The Defense argument is misplaced.  Since *Miller,*

19     the Supreme Court has said that the standards announced in

20     that case are applicable to federal legislation and that to

21     the extent any doubt exists about the constitutionality of a

22     federal obscenity statute, courts are free to construe that

23     statute in line with the *Miller* test.

24          Both statutes at issue here regulate obscene

25     materials, and according to *Miller,* no individual item can be

obscene if taken out of context.  Even if these statutes could

be read, as the Defendants suggest, to permit an individual

item to be judged out of context, this court need not read the

statutes that way because a limiting construction is readily

available.  See *Broadrick versus Oklahoma.*

Because the obscenity statutes forbid the

distribution of items that are obscene and because *Miller* and

its progeny define an item as obscene only in relation to the

larger work, the Court may reasonably construe the obscenity

statutes to require that the listed items be judged, not in

isolation, but in the context of the work of which they are a

part.

Now, with regard to vagueness.  In addition to

overbreadth, the Defendants argue that *Miller*'s as a whole

requirement is unconstitutionally vague because it is unclear

how that requirement would apply in the context of the

Internet.  Specifically, the Defendants point to Justice

Kennedy's concurrence in *ACLU I* where he stated that it was

unclear, quote, whether what is to be judged as a whole is a

single image on a web page or a whole web page, an entire

multiple website or an interlocking set of websites, close

quote*, ACLU I* at 593.

The Supreme Court has made clear that a lack of

precision is not itself offensive to the requirements of due

process, *Roth v. United States.  Miller*'s definition of

1  obscenity and in particular the as a whole requirement are

2  sufficiently definite in the context of the Internet to

3  survive yet another constitutional challenge on vagueness

4  grounds.  Indeed, the Supreme Court itself concluded in *Miller*

5  that its test for defining obscenity would provide fair notice

6  to a dealer in such materials that his public and commercial

7  activities may bring prosecution.

8         Even though the Defendants invite this court to

9  revisit that determination, I will not do so just because a

10  new medium is at play.  As a constitutional matter, I am

11  confident that the relevant obscenity statutes, when read

12  against the backdrop of a long line of Supreme Court cases

13  interpreting obscenity, provides sufficient guidance to

14  Internet publishers that whatever arguably obscene material

15  they distribute on the Internet will be judged not in

16  isolation but in context.

17         Now, having concluded that the Section 1465 and

18  Section 223(d) are not unconstitutionally vague as applied to

19  Internet speech, I will briefly address Defendants' argument

20  that the entire website is the relevant work to be judged in

21  Counts 3 and 7 of the indictment.  In fact, Defendants contend

22  that the movie trailer that forms the basis of the obscenity

23  charges is just one small part of the overall Evil Angel

24  website.  I disagree.

25         The appropriate context in which to evaluate the

trailer is, at an minimum, the web page on which the trailer

was posted.  At the appropriate time, I will address on a

case-by-case basis whether other pages of the website should

be considered as well.

Next, with respect to the strict scrutiny argument,

the Defendants also assert that Section 223(d) which prohibits

the use of the Internet to display, quote, obscene, close

quote, material in a manner available to minors, is a

content-based regulation that cannot survive strict scrutiny.

I reject this argument out of hand because obscenity, as

defined in *Miller*, is not protected by the Constitution.

Accordingly, statutes like Section 223(d) that regulate

obscene materials in a viewpoint neutral way are not subject

to strict scrutiny.

As for their substantive due process argument,

having disposed of the Defendants' overbreadth and vagueness

arguments, I will now briefly address their more sweeping

claim that the entire prosecution should be dismissed because

the Constitution creates a substantive due process right to

sexual privacy that includes both the right of individuals to

possess obscene material and, by extension, the right of

publishers to provide that material to willing recipients.

The Defendants, not surprisingly, rely on a long

line of privacy cases, beginning with *Griswold v. Connecticut,*

and culminating with *Lawrence v. Texas*, to make two basic

1    points.  First, they contend that the sum of these cases

2    establishes a constitutional protected liberty interest in

3    sexual privacy which includes the right to possess obscene

4    materials and the correlative right to distribute or obtain

5    those materials.

6           Second, they contend that the Government is

7    powerless to regulate on obscenity in the public square

8    because morality is not a rational, much less compelling,

9    basis for overcoming that liberty interest.

10           The Court rejects that notion that the liberty

11    interest account in *Lawrence* somehow includes a right to

12    obtain or distribute obscenity.  The Defendants misconstrue

13    the nature of the liberty interest at stake in that case.

14    What is evident from the Supreme Court's decision and its --

15    is its intent to prevent the state from burdening certain

16    intimate, consensual relationships by criminalizing the

17    private sexual acts that are instrumental to those

18    relationships.

19           In defining the contours of the liberty interest,

20    the Supreme Court made a point to note that the statutes

21    challenged in *Lawrence,* quote, seek to control a personal

22    relationship that is within the liberty of the persons to

23    choose without being punished as criminals, close quote.  539

24    U.S. at 567.  The possession and use of obscenity are hardly

25    analogous to the sexual acts the Court in *Lawrence* found to be

so instrumental to the relationships of homosexual persons.

Indeed, the liberty interest that the Defendants claim pales

in comparison to the liberty interest at stake in *Lawrence*.

As a result, I reject the Defendants' contention

that the Constitution creates a so-called right to sexual

privacy so fundamental and so sweeping that it includes the

right to obtain, as well as the correlative right to

distribute obscene materials in the public marketplace.

Furthermore, to the extent that *Lawrence* rejects

public morality as a legitimate governmental interest, it does

so only in the narrow context of private conduct that has no

potential to harm others.  Unlike the law at issue in

*Lawrence*, the obscenity statutes at issue in this case do not

target purely private activity.  To the contrary, they target

the public dissemination or the possession for sale of obscene

materials, which the Supreme Court has repeatedly held to be

within the Government's power to regulate.

Although public morality may be an insufficient

justification for regulating private conduct in some cases, it

is certainly a sufficient justification for regulating the

sort of public conduct at issue here.

Finally, let me address briefly the Defendants'

copyright protection argument that the facial validity of the

obscenity statute, to say the -- well, to say the least, this

argument is rather novel.  They claim that the statutes burden

1    the right to obtain copyright protection for speech that is

2    protected in some jurisdictions but not in the District of

3    Columbia.  To enforce a copyright, publishers must register

4    their works by shipping a copy to the Copyright Office in

5    Washington, D.C.  Because this requirement would expose

6    publishers of otherwise protected works to potential criminal

7    liability in the District of Columbia for violations of the

8    obscenity statute, the Defendants contend that those

9    publishers would be deterred from obtaining copyright

10   protection for their protected works.  I disagree.

11        First, any burden on the publisher's ability to

12   register a copyright has no constitutional ramifications

13   because there is no constitutional right to copyright

14   legislation.  Article I of the Constitution authorizes

15   Congress to provide copyright protection.  It does not create

16   an individual right to that protection.

17        Second, to the extent that the inability to obtain

18   copyright protection burdens the First Amendment right of

19   publishers whose works would be protected in one jurisdiction

20   but not in the District of Columbia, the Defendants' argument

21   is nothing more than a reformulation of their argument that

22   *Miller*'s, quote, community standards, close quote, requirement

23   is overbroad as applied to publishers who cannot control the

24   geographic reach of their alleged obscene materials.

25        As this Court has already explained, however, that

1   fact alone cannot invalidate the obscenity statutes at issue

2   in this case.

3          Therefore, having considered all the arguments

4   Defendants have presented, the Court concludes that no basis

5   exists to overturn the obscenity statutes charged in the

6   indictment.  Accordingly, Defendants' respective motions to

7   dismiss are denied.  An opinion setting forth this analysis in

8   greater detail will be forthcoming in the near future.

9          Now, Counsel, I have not, since I've been on this

10  court, granted an interlocutory appeal in any case of a

11  criminal nature.  I do appreciate, however, this is not a

12  typical case.  I am not inviting one on the one hand, but on

13  the other hand, I fully appreciate that because of the nature

14  of the issues involved here and the consequences -- the

15  practical consequences to the Defendant -- Defendants, this

16  may be one where it is appropriate, and I think an opportunity

17  for both sides to have their say as to whether this one should

18  be -- warrant an interlocutory appeal, I think should be --

19  you know, an opportunity should be provided to both sides to

20  put their position on the record in that regard.

21         So, the way I would envision this going would be as

22  follows:  The next three or four weeks can be used

23  productively by everyone here.  Me, completing my opinion;

24  you, getting ready to draft your -- file your motion for

25  interlocutory appeal.  The Government, well, I guess there's a

1   chance the Government won't oppose it, but on the other hand,

2   my instincts tell me the Government will oppose it.  I don't

3   know.  That's up to the Government.  I'm not getting in the

4   middle of that.

5          You take -- you start formulating whatever your

6   position is.  They will -- I'm sure they probably have already

7   written what their position already is, and I will hold a --

8   as soon as my opinion is released officially, then you can

9   file your motion literally the next day if you want or that

10  day if you want, frankly.  It doesn't matter to me.  You can

11  file your motion for interlocutory appeal.  The Government, if

12  they're opposing it, can have another ten days or two weeks to

13  file its opposition, but hopefully, the next three or four

14  weeks won't be lost.  You'll be gearing up, so to speak, but I

15  want to move quick.  The point is I want to move quickly.

16         You know, obviously this has been hanging over the

17  Defendants' heads, it's been hanging over the company's heads

18  for a long time.  It took a lot of work to get just to where I

19  am today and it's taken a lot of work to get to the point

20  where I am in terms of the opinion, and so I think fairness

21  dictates that we move relatively rapidly on this point.

22         Now, we'll schedule oral argument after the motions

23  are filed on that limited issue of an interlocutory appeal.

24  I'll hear the arguments.  I won't have to write an opinion.

25  I'll either grant it or deny it.  Obviously, if I grant it,

1   the case is on hold.  It goes to the D.C. Circuit, and once it

2   goes to D.C. Circuit, it's out of my hands.  It will -- it

3   will take a year at least.  That's quick.

4          I don't need to remind you the Guantanamo detainees

5   are sitting in a prison and the appellate process took

6   three-and-a-half years between the D.C. Circuit and Supreme

7   Court, three-and-a-half years in the *Boumediene* case.  So, I

8   don't know how long it will take.  Once it's out of my hands,

9   I have no control, obviously.  You need to think that all

10  through.  I'm sure you already have, but I'm stating the

11  obvious.

12          If I deny it, I'm not even sure it's reviewable, my

13  denial.  I don't think it is, but if I deny it, then we'll

14  have a status hearing immediately and I'll announce a decision

15  and we will set a trial schedule, we will set any other

16  motions that need to be filed scheduled, and I'd like to get

17  this case tried sooner rather than later.  My guess is

18  probably the soonest would be late spring, early summer.

19  That's about the fastest we can probably get everyone -- get

20  everybody together, finalize any and all issues for discovery,

21  do the pretrial conference, work out all the issues with

22  regard to jury selection, probably have to do a questionnaire.

23  I'm not sure.

24          This is not a normal case in the sense of our

25  typical run-of-the-mill gun and drug cases.  It just isn't.

1    So, there will be a lot of moving parts, or a lot more moving

2    parts than we normally have in a criminal trial, even in the

3    big ones we have here.

4           So, I appreciate the novelty of the circumstances.

5    My sense is that the ramp-up time will take about four to six

6    months, and that's in the best case scenario if I don't grant

7    the motion for interlocutory appeal.  I just don't see how we

8    try this case before May or June or something like that.  It's

9    just going to be hard to do that.  Might be doable.  The trial

10   itself probably won't be that long, you know, maybe a couple

11   of weeks.  I don't know.  More?

12           MS. SATTERFIELD:  Less.

13           THE COURT:  Less.  Okay.  Well, that's good.  That's

14   a start in the right direction, you know, we're moving in the

15   right direction.  So, maybe it could be tried next summer.

16   Then, of course, obviously, if there were a conviction, then

17   obviously there's an appeal process after that, and then if

18   there isn't, then move on.

19           So, you-all can noodle it, think it over and decide

20   how you want to proceed in terms of the motion for a

21   interlocutory appeal, and I didn't want you to lose this next

22   month, you know, in a state of uncertainty.  So, I appreciate

23   your patience, and I'll answer any questions you have within

24   reason.

25           Let's start with the Government.  Does the

1    Government have any questions about the procedure that I have

2    sort of laid out here as to how to move forward?

3            MS. SATTERFIELD:  No.  That sounds fine.  I just

4    wondered could we set some dates and then how are we on speedy

5    trial?

6            THE COURT:  Well, I think the Speedy Trial Act has

7    been in a state of suspension due to the motions.  This is a

8    complex case.

9            MS. SATTERFIELD:  Right.  And so -- I have two --

10   the Government has two other motions pending.

11           THE COURT:  Right.

12           MS. SATTERFIELD:  I think we're tolled.

13           THE COURT:  I'm not ruling on those.

14           MS. SATTERFIELD:  Okay.  I just want to make sure.

15           THE COURT:  Not right now.  I'm focusing on the main

16   event.  We'll deal with the other ones at the appropriate

17   time.  There's no reason to deal with them right now as far as

18   I can tell.  I don't see any reason to.

19           I mean, this is obviously the overarching legal

20   question for this case, and it has to get resolved one way or

21   the other.  And -- I mean, I'm stating the obvious here.  I

22   mean, this is -- this is such an unusual case that it's a

23   strong argument.  I haven't read their pleadings yet, and I

24   don't know what the Government's going to say, but I think

25   it's a very strong situation for a interlocutory appeal.  This

1    is not a normal case.

2           Now, obviously the Defendant and -- the Defendants,

3    the Defendant as an individual and the corporate entities have

4    to think through, with their counsel's assistance, having that

5    uncertainty for yet another year plus because it will be --

6    there's no way the Court of Appeals is going to brief and rule

7    on this within a year.  That's just not happening.  It's not

8    possible.

9           It's just not -- there's not going to be -- there

10   won't be any kind of -- I don't think, any kind of expedited

11   appeal.  Like I said, if they're not doing it for Guantanamo

12   detainees who are in prison, it's just not realistic.  So, you

13   have to think through, obviously you already have, I'm sure,

14   the practical ramifications of pursuing an interlocutory

15   appeal because it will be -- the case will be on hold for at

16   least a year, at least, and that may be acceptable.  That may

17   not be.  I don't know.  That's up to you-all.

18          But this is, I think, a strong and a usual

19   circumstance that, you know --

20          MS. SATTERFIELD:  Your Honor, I do have a D.C.

21   Circuit case that talks about interlocutory appeals in only

22   three circumstances:  Double jeopardy, speech and debate

23   clause and -- one moment -- motions to reduce bail.  And this

24   is a case, *United States versus Crosby,* D.C. Circuit, 1994, 20

25   Fed 3d 480.

1          THE COURT:  Uh-huh.

2          MS. SATTERFIELD:  I just throw that out there.  So I

3    think it may be unlikely, but we certainly can brief the

4    issue.

5          THE COURT:  Yeah.  No, that's right, and obviously

6    the Government has its own equities that it has to evaluate,

7    and not the least of which is the precedent.  I mean, if you

8    were to agree to it, I mean obviously the Government has to

9    think through what are the practical ramifications of that in

10   future cases down the road.

11         But this is such an unusual case.  I mean, it really

12   is, and I'm stating the obvious.  So I'll wait and see what

13   the briefings show in that regard, and if it should come to

14   pass that you don't want to seek an interlocutory appeal, I'll

15   set a -- I'll schedule a hearing ASAP to go over all these

16   other issues and set a trial schedule and we'll have a game

17   plan for motions -- any other motions that need to be filed or

18   have been filed and then pretrial conference.

19         And you know, obviously this is a case that will

20   also have some unique voir dire questions, voir dire issues,

21   and ultimately very unique jury instructions, too.  So, this

22   is a case that's going to have lots of novel issues, and --

23   but this is the overarching issue.  This is the big, big

24   question so...

25         MS. SATTERFIELD:  That sounds fine, Your Honor.  So

1    we'll have a date then for -- they go first?

2          THE COURT:  Well, I think -- I think the game plan

3    is that while you're all doing your own preparations, in the

4    meantime, as soon as my opinion is issued, that's really the

5    ruling that you'd be appealing from.  Until it's issued, you

6    don't really have the ruling.  I'm giving you today, basically

7    a preview of coming attractions.  You know what's coming out

8    and you have the benefit of knowing it earlier than you

9    otherwise would have known about it so that you can start

10   taking the necessary steps to move to the next phase in the

11   process.

12         And I would be lying if I told you the exact date my

13   opinion will come out.  I don't.  Because unfortunately, we're

14   down three judges.  Each of us has a 30-plus percent increase

15   in our caseload, you know, well over 300 cases, marked

16   increase in the number of PI's that we're handling.  You know,

17   this is one of many cases that I'm juggling, and my goal is to

18   have it out in the next three or four weeks.  By the end of

19   January.

20         Let's put it in general -- I'll put it in round

21   terms, by the end of January.  So I would think that the

22   sequence of events would be, my opinion comes out.  Within a

23   matter of days, the Defendants are in a position to file their

24   motion for interlocutory appeal because they will have had

25   already three or four weeks to get it ready, right, and then

1    as soon as they file theirs, then you can have -- is two weeks

2    enough from that point on?

3         MS. SATTERFIELD:  That's fine.

4         THE COURT:  Okay.  So you'll have two weeks from the

5    day they file theirs to file your response, and then they can

6    have -- you want a week to reply or two weeks?  Ten days, how

7    about split the baby, ten days to reply, okay.  So you can

8    have ten days to reply to their opposition, and then I will

9    just issue a minute order setting a date for the argument.

10        I mean, it doesn't make sense to set it today

11   because I don't know what the exact dates these will be, but I

12   will definitely -- this will trigger a sequence of events and

13   one of which will be I will schedule a hearing for the -- for

14   the oral argument on that limited issue, the motion for the

15   interlocutory appeal.  That's the only purpose for that

16   hearing.

17        And -- well, I think that's -- basically gets us to

18   the decision point, and I would expect, frankly, by the point

19   I have the oral argument, I will have, of course, read all the

20   briefs and I won't have to write an opinion basically on that

21   ruling.  That's not an opinion-type ruling.  And I will issue

22   a decision on that probably very quickly.  I would say within

23   a week, maybe not -- maybe not even a week, so that you then,

24   you know, know where we stand.  And if I grant it, then you're

25   off to the D.C. Circuit.  If I deny it, then I'll set a status

1    hearing to start scheduling whatever needs to be done,

2    including the trial.

3         But I think from a planning point of view for both

4    sides, you know, I wouldn't plan on a four-month vacation this

5    summer because there's a chance there might be a trial this

6    summer, you know, sometime -- starting sometime between May

7    and July, in that timeframe, so I wouldn't, you know, plan on

8    any long trips abroad during that period.

9         Do you-all have questions?  Is it pretty clear to

10   you-all?

11        MR. CAMBRIA:  Your Honor, appreciate that.  I think

12   we will obviously order a copy of the transcript and that will

13   aid us in putting our remarks together, and these are such

14   important and complex issues that I don't see an issue with

15   the Speedy Trial Act, and obviously we're in a position to

16   enter whatever orders necessary to accommodate resolving these

17   kind of novel and troublesome issues.

18        THE COURT:  Yeah.  These are very complex and

19   difficult questions and novel questions, and who knows where

20   it's going to end up, but it could very well end up in Supreme

21   Court.  I mean, there's a very real possibility.  So I

22   don't -- you know, I don't have a crystal ball.  I don't know

23   where we're headed.  Yeah, of course.

24        MR. GELBARD:  First, Your Honor, thank you for your

25   time.  You obviously put a lot of effort in putting this

together.  My initial thought is to ask the Court, it strikes

me that the Court fully appreciates the novelty of the cases

here and rather than having both sides begin briefing the

motion for interlocutory appeal, I believe this court has the

opportunity to simply certify the matter for direct appeal,

and if what you're trying to do is move the issue forward, I

mean, we'll be happy to brief if that's what you want, but I

think the issues are there.  And if -- if the Court is

inclined to go that way and if the Court does fully appreciate

it, that's another option the Court has.

THE COURT:  Well, I know.  I just think it's --

it's -- you know, I think it's cleaner to just have the motion

filed and for the Government to have its opportunity to be

heard on it.  I want to make sure, again, because it's so

novel, I mean, we don't -- not in this circuit.  I don't know

about other circuits.

MR. GELBARD:  I told you when we first met that this

was going to be different.

THE COURT:  You were right.  You know, I've been

around here almost eight years now and I've never heard of an

interlocutory appeal in a criminal case.  I'll be honest with

you.  Maybe there's one out there, I just haven't heard of it,

but I think I would have heard about it.  But I think this is

a pretty unusual circumstance, but this is a very unusual

case.

1          So we don't -- we don't have cases like this every

2    day.  Thank you.

3          MR. GELBARD:  Thank you.

4          THE COURT:  And I appreciate the parties.  It wasn't

5    easy to get out here, but this is important.  This is an

6    important juncture in the road and you have a better sense of

7    where you stand now and at least what the options are in the

8    near future as to how to proceed.  So, I thought it was

9    sufficiently important a juncture in the process that everyone

10   be here, and it has been awhile since our last get-together

11   anyway.

12          So, I'm mindful of the cost and the burden, but I

13   thought this was an important juncture in the process, so I

14   didn't do it lightly, and I appreciate your efforts to get

15   here.

16          Mr. Stagliano has been in full compliance and I'm

17   happy to know that and hope it stays that way.  I'm sure it

18   will.  And we'll move forward and get to the next phase of

19   this process, and I appreciate everyone's patience in getting

20   this to this place.  It's not been an everyday matter.

21          Happy holidays.

22          THE DEPUTY CLERK:  All rise.  This honorable court

23   stands in recess.

24          (PROCEEDINGS END AT 11:45 A.M.)

25                    *-*-*-*-*

1
2
3
4
5
6
7
8
9
10
11
12
13                        **CERTIFICATE OF REPORTER**
14          I, Catalina Kerr, certify that the foregoing is a
15   correct transcript from the record of proceedings in the
16   above-entitled matter.
17
18
19
20
21   _____     _____
     Catalina Kerr                        Date
22
23
24
25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25